IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA15-977

Filed: 1 November 2016

Mecklenburg County, No. 14 CVS 4758

WILLOWMERE COMMUNITY ASSOCIATION, INC., a North Carolina non-profit corporation, and NOTTINGHAM OWNERS ASSOCIATION, INC., a North Carolina non-profit corporation, Plaintiffs,

v.

CITY OF CHARLOTTE, a North Carolina body politic and corporate, and CHARLOTTE-MECKLENBURG HOUSING PARTNERSHIP, INC., a North Carolina non-profit corporation, Defendants.

Appeal by plaintiffs from order entered 14 April 2015 by Judge Forrest D. Bridges in Superior Court, Mecklenburg County. Heard in the Court of Appeals 27 January 2016.

> *Kenneth T. Davies, for plaintiff-appellants.*
>
> *Assistant City Attorney Thomas E. Powers III and Senior Assistant City Attorney Terrie Hagler-Gray, for defendant-appellee City of Charlotte.*
>
> *Moore & Van Allen, PLLC, by Anthony T. Lathrop and Glenn E. Ketner, III, for defendant-appellee Charlotte-Mecklenburg Housing Partnership, Inc.*

STROUD, Judge.

Plaintiffs appeal the trial court's order allowing defendants' motion for summary judgment. The trial court correctly granted summary judgment dismissing plaintiffs' lawsuit based upon lack of standing to file the suit because neither plaintiff complied with their respective bylaws to authorize initiating litigation.

I.       Background

In September of 2013, defendant Charlotte-Mecklenburg Housing Partnership, Inc. ("CMHP") sought and obtained rezoning of about 7.23 acres abutting portions of the residential subdivisions represented by plaintiffs Willowmere Community Association, Inc. ("Willowmere") and Nottingham Owners Association, Inc. ("Nottingham") (collectively "plaintiff HOAs").  Defendant CMHP planned to develop up to 70 multifamily housing units on the property which had been previously approved for development as a child care center.  The rezoning was hotly contested by local residents and plaintiffs at the public hearing in December of 2013, but ultimately the City Council approved the rezoning application.  Plaintiffs then filed this lawsuit challenging the rezoning.  This appeal does not involve the substance of plaintiffs' challenges to the propriety of the rezoning but only plaintiffs' legal standing to bring the claim, so we will address only the relevant background regarding the issues before this Court.

In October of 2014, plaintiff HOAs requested summary judgment in the action they had brought against defendants.  Later in October, defendant CMHP filed a cross-motion for summary judgment.  In November of 2014, defendant City also filed a cross-motion for summary judgment.

After a two-day hearing on the summary judgment motions, the trial court entered an order in April of 2015 agreeing with all the parties "that there is no

genuine issue of material fact" and ultimately resolving the legal issue of standing in favor of defendants, determining that plaintiffs did not have standing to bring the action because "they failed to follow the requirements in their respective bylaws with regard to their decisions to initiate this litigation." Though findings of fact are not required in a summary judgment order, *see generally* N.C. Gen. Stat. § 1A-1, Rule 56(c) (2013), the trial court made 14 findings of fact "[i]n order to explain the Court's reasoning in reaching its conclusion[.]" The trial court noted the findings it had made were uncontested, including:

> 2.    Willowmere admitted, in the deposition of its corporate representative, Michael J. Kelley, that its Board of Directors decided to initiate the lawsuit without a formal meeting. Willowmere produced an email string among the directors that it claimed was sufficient to serve as written consent to action outside a meeting under Article III, Section 18 of its bylaws.
>
> 3.    An email consent of this type is not expressly authorized by Willowmere's bylaws to satisfy the requirement of written consent, signed by all of the Directors of Willowmere.
>
> 4.    Although N.C.G.S. § 55A-1-70 permits North Carolina non-profit corporations to agree to conduct transactions through electronic means, the undisputed evidence is that Willowmere has not taken any action permitting it to invoke this statute. Consequently, there is no authorization for the email string to serve as a written consent to action without a formal meeting.
>
> 5.    It follows that Willowmere did not act in accordance with its bylaws with regard to its decision to initiate this litigation. Therefore, Willowmere lacks

standing.

6. To establish the propriety of the decision by Nottingham to initiate this lawsuit, Nottingham relies on the deposition testimony of its representative, Mr. Kenneth S. Anthonis, who testified that he had a telephone conversation with at least one other director. The record does not reveal a meeting with a quorum of directors present either in person or by phone at which the filing of the litigation was authorized. The record also does not reveal that the Board filed written consents or minutes reflecting the proceedings of the Board, nor that the Board posted the explanation of the action taken within three (3) days after the written consents of the Board were obtained, as required under Article 5, Section 5 of Nottingham's Bylaws.

7. Mr. Anthonis testified in his deposition, as the corporate representative of Nottingham, that there had been no formal meeting of the Nottingham Board of Directors at any time to decide to file this lawsuit. In his deposition transcript, Mr. Anthonis stated affirmatively that there were no written consents or minutes memorializing the decision to proceed with the lawsuit.

8. The failure to comply with Article 5, Section 5 of Nottingham's bylaws concerning action by directors taken without a meeting, discussed above with respect to Willowmere, is also present for Nottingham, which, therefore, also lacks standing.

9. While Plaintiffs' bylaws each permit their directors to sue regarding matters affecting their planned communities, the directors can only act through a meeting or a consent action without a meeting. Neither Willowmere nor Nottingham has met their burden to show that their directors acted to initiate this litigation through one of these means in this case.

10. Defendants' arguments regarding Plaintiffs'

standing present a challenge to the jurisdiction of the Court. Under N.C. Rule 12(h)(3), a challenge to jurisdiction may be brought at any time.

11. For the reasons discussed above, the Court concludes that Plaintiffs lack standing, and consequently that the Court lacks jurisdiction to hear their challenge to Ordinance 5289-Z adopted by the City.

Plaintiffs appeal.

## II. Standing

The only issue before this Court on appeal is regarding whether plaintiffs have standing to bring this action; none of the underlying issues which led to this action are before this Court. Plaintiffs make three arguments regarding standing: (1) defendants do not have standing to challenge plaintiffs' standing on the basis asserted; (2) plaintiffs have standing because they complied with their bylaws in approving filing the lawsuit; and (3) even if they failed to comply with their bylaws, these violations are non-jurisdictional, and thus they still have standing.

A. Raising the Issue of Standing

Plaintiffs first contend that "defendants lack both statutory standing to challenge the validity of the associations' actions, and contractual standing to enforce the associations' bylaws." (Original in all caps.) Essentially plaintiffs contend that since defendants are not parties to the bylaws, they do not have standing to raise a standing issue based upon any alleged violation of plaintiffs' bylaws.

Standing is a necessary prerequisite to a court's

proper exercise of subject matter jurisdiction. As the party invoking jurisdiction, plaintiffs have the burden of establishing standing. . . .

. . . .

Our standard of review on appeal of a trial court's dismissal on the grounds of lack of standing is *de novo*.

*Marriott v. Chatham Cty.*, 187 N.C. App. 491, 494, 654 S.E.2d 13, 16 (2007) (citation and quotation marks omitted).

Although defendants do argue in support of the trial court's conclusion that plaintiffs lack standing, defendants did not initially raise standing as a defense; standing was not raised in defendants' motions to dismiss, answers, or motions for summary judgment. Unfortunately, the second day of the hearing on 12 March 2015 was not recorded, but by plaintiffs' own characterization,

[f]ollowing a hearing on the parties' cross-Motions for Summary Judgment on 14 January 2014, the Honorable Forrest D. Bridges took the matter under advisement. The parties reconvened before Judge Bridges on 12 March 2015 to receive his decision, *at which time Judge Bridges unexpectedly requested further argument on the issue of the Associations' standing.*

(Emphasis added).

As neither defendant had raised the issue of standing in the answers or substantive motions and as "Judge Bridges unexpectedly requested further argument on the issue of the Associations' standing[,]" it appears that the trial court raised the issue of standing *ex mero motu*. Since "[s]tanding is a necessary prerequisite to a court's proper exercise of subject matter jurisdiction[,] *id.*, "a court has inherent

power to inquire into, and determine, whether it has jurisdiction and to dismiss an action ex mero motu when subject matter jurisdiction is lacking." *Reece v. Forga*, 138 N.C. App. 703, 704, 531 S.E.2d 881, 882 (2000). Furthermore, even assuming *arguendo* that defendants did raise the issue of standing, once the issue was raised and appeared to have merit it was appropriate for the trial court to consider the issue on its own motion.[1] *See generally Fort v. Cnty. of Cumberland*, 218 N.C. App. 401, 404, 721 S.E.2d 350, 353 (2012) ("Whether a party has standing to maintain an action implicates a court's subject matter jurisdiction and may be raised at any time, even on appeal." (citation and quotation marks omitted)). Therefore, whether raised by defendants or by the trial court's own motion, the trial court properly considered plaintiffs' standing to bring this action, and we likewise must consider the issue.

B.     Plaintiffs' Compliance with Bylaws

Plaintiffs next contend that they had standing to bring this action because "the associations did, in fact, each comply with the requirements of their respective bylaws to initiate litigation." (Original in all caps.)

1.     Plaintiff Willowmere

Plaintiff Willowmere argues that "Willowmere's Board, acting without a meeting, unanimously authorized litigation through a chain of emails." Plaintiff

---

[1] The trial court found "[d]efendants' arguments regarding [p]laintiffs' standing present a challenge to the jurisdiction of the Court." It is unclear from this sentence whether defendants initially raised the issue of standing, but even if they did not, they obviously argued that plaintiffs did not have standing once the trial court raised and requested argument on the issue.

Willowmere notes that its bylaws provide:

> Section 18. <u>Action Without a Formal Meeting.</u> Any action to be taken at a meeting of the Directors or any action that may be taken at a meeting of the Directors may be taken without a meeting if a consent in writing, setting forth the action so taken, shall be signed by all the Directors. An explanation of the action taken shall be posted at a prominent place or places within the Common Area within three (3) days after the written consents of all the Board members have been obtained.

Plaintiff Willowmere argues that its emails "comply with the requirements of [its] bylaws to initiate litigation." (Original in all caps.)

But even if we assume that plaintiff Willowmere's interpretation of its bylaws is correct *and* it could use email in compliance with North Carolina statutes, those emails are not part of our record on appeal. "As the party invoking jurisdiction, plaintiffs have the burden of establishing standing." *Marriott*, 187 N.C. App. at 494, 654 S.E.2d at 16. Without the emails which plaintiff Willowmere claims establish its compliance with its bylaws to initiate litigation, plaintiff Willowmere has not carried its burden. In addition, even if the emails did authorize the filing of the action, there is no evidence that "an explanation of the action taken" was "posted at a prominent place or places within the Common Area within three (3) days after the written consents of all the Board members" were obtained by email. Plaintiff Willowmere's board's action was not taken in compliance with its bylaws.

2.     Plaintiff Nottingham

Plaintiff Nottingham argues that its board "authorized litigation via a telephone conversation" so it was not required that the board hold an actual meeting to authorize initiation of litigation. Plaintiff Nottingham argues that telephone conversations qualified as the board's meeting and argues that defendants "misconstru[ed]" their president's statements made during his deposition that there was no meeting held. Plaintiff Nottingham then quotes the president's deposition with the following bold, italics, and underlining emphasis inserted by plaintiffs:

> Q. Was there an official meeting of the board at which the decision was taken?
>
> A. It was ***phone conversation***, so not an official board meeting.
>
> . . .
>
> Q. Did you have a three-way telephone conversation between – or maybe a four-way between the members of the board who participated *and* the management company?
>
> A. No. I talked with the management company ***and then talked separately with the board***.

Turning to the actual deposition though, and not merely plaintiff's quoted portions, it is clear that plaintiff Nottingham's president did not consult the relevant bylaws:

> Q. And was input on that decision sought from the members of the association?
>
> A. No.

. . . .

Q. Was there a formal board meeting of Nottingham at any time at which the decision to initiate this lawsuit was discussed?

A. No.

Q. Did you and Ms. Tomljanovic and possibly Mr. Viscount refer to any specific provisions in the governing documents of Nottingham to determine whether you had the power to make that decision?

A. We sought advice from the management company.

Q. So you did not refer to the documents?

A. We did not refer to the documents, no.

. . . .

Q. All right. Did the management company identify any specific provision in the bylaws or any other governing document to grant the board the power to make those two decisions we were just talking about?

A. Not that I recall, no.

Q. Let me refer you back to Exhibit 10-B, which is the bylaws. After the decision that you talked about – or the two decisions that you talked about to initiate the lawsuit and to pay for counsel, did the board or the management company produce written consents memorializing that decision?

A. No.

Q. Is there any provision that you're aware of in this

> bylaws document, Exhibit 10-B, that grants either the association or the board of the association the power to initiate lawsuits?

A.   Not that I'm aware of, no.  I'll clarify that and say there may be, but I don't know off the top of my head that there is.

Q.   One of the topics for your deposition today that you were to be prepared for was to talk about the governing documents of the organization, correct?

A.   Yes.

Q.   And you're not aware of any provision in there that permits the organization or the board acting for the organization to initiate a lawsuit, correct?

A.   Correct.

Based upon plaintiff Nottingham's president's deposition, the trial court correctly noted as an undisputed fact that plaintiff Nottingham's board did not hold a meeting open to members, as contemplated by the bylaws, at which they approved initiation of the lawsuit.

Defendants contend that the trial court correctly determined that plaintiff Nottingham did not hold a meeting either pursuant to article 7, section 1 of plaintiff Nottingham's bylaws for "Regular Meetings" or pursuant to article 7, section 2 for "Special Meetings[,]" both of which by the plain language of the provisions require prior written notice.  Defendants argue that the only way for plaintiffs to properly take action without a meeting is pursuant to article 5, section 5 of plaintiff

Nottingham's bylaws entitled "Action Taken Without a Meeting." However, article 5, section 5 requires "written consent of all of the Directors[,]" and it is uncontested that there was no written memorialization, so this section cannot apply. Nonetheless, plaintiff Nottingham contends that its bylaws do not prohibit holding a meeting of the board by teleconference and that "Board was permitted to hold a *regular* meeting through a simultaneous teleconference." (Emphasis added.) Plaintiff Nottingham also argues that this type of meeting is permissible under North Carolina General Statute § 55A-8-20, which provides:

> (a)     The board of directors may hold regular or special meetings in or out of this State.
>
> (b)     Unless otherwise provided by the articles of incorporation, the bylaws, or the board of directors, any or all directors may participate in a regular or special meeting by, or conduct the meeting through the use of, any means of communication by which all directors participating may simultaneously hear each other during the meeting. A director participating in a meeting by this means is deemed to be present in person at the meeting.
>
> (c)     Unless the bylaws provide otherwise, special meetings of the board of directors may be called by the president or any two directors.

N.C. Gen. Stat. § 55-8-20 (2013).

But even if plaintiff Nottingham's board could hold a teleconference meeting under the bylaws and North Carolina General Statute § 55-8-20, the bylaws require more than simply a conversation among some of the directors, whether in person or

- 12 -

by telephone. For example, both "Regular Meetings[,]" the type plaintiff Nottingham argues was conducted, and "Special Meetings" have specific requirements regarding advance notice of the time and location of the meeting. In addition, all meetings, regular and special, "shall be open to all members of the Association; provided, however, that Members who are not Directors may not participate in any deliberation or discussion unless expressly so authorized by the vote of a majority of a quorum of the Board." The Board is also required to "[c]ause to be kept a complete record of all its acts and corporate affairs" pursuant to article 8, section 3, and the secretary is to "keep minutes of all meetings of the Board" pursuant to article 9, section 8(c), so there should be a written memorialization for any meeting, whether in person or by phone. It is undisputed that there was no written advance notice of the place or time of the alleged phone meeting and there are no minutes from the alleged phone meeting. Thus, even if the Board could have held a meeting by telephone, it would still have to comply with the other requirements of the bylaws for meetings, particularly notice, so that members would at least have the opportunity to be aware of the board's actions. In summary, plaintiff Nottingham's evidence shows, at most, that the president and some directors discussed initiating this lawsuit by phone, without prior notice to anyone of the time or place, and no written memorialization of either the meeting or the decision to initiate litigation were kept. Nottingham has failed to show that it held a regular meeting or a special meeting in accordance with its bylaws

at which the directors could authorize initiating litigation.

C.      Non-Jurisdictional Violations

Lastly, plaintiffs argue that even if they did violate their own bylaws in filing their lawsuits without first obtaining proper authorization, these violations are merely technical, non-jurisdictional violations and would not affect their standing to bring this action. Plaintiffs make two specific arguments regarding why they should still have standing even without compliance with their bylaws.

First, plaintiffs contend that "[t]he plain language of the Bylaws do not evidence any jurisdictional limitations or a prelitigation requirement[.]" But plaintiffs misapprehend the meaning of jurisdiction. Jurisdiction is neither granted nor taken away by private bylaws since parties themselves cannot confer subject matter jurisdiction upon a court, even by consent:

> Subject matter jurisdiction refers to the power of the court to deal with the kind of action in question and is conferred upon the courts by either the North Carolina Constitution or by statute. Subject matter jurisdiction rests upon the law and the law alone. It is never dependent upon the conduct of the parties. Specifically, subject matter jurisdiction cannot be conferred by waiver or consent of the parties.

*Mosler v. Druid Hills Land Co.*, 199 N.C. App. 293, 295, 681 S.E.2d 456, 458 (2009) (citations, quotation marks, and brackets omitted).

The trial court granted summary judgment in favor of defendants not due to general subject matter jurisdiction but due to a lack of plaintiffs' standing.

> Parties without standing to bring a claim, cannot invoke the subject matter jurisdiction of the North Carolina courts to hear their claims.
>
>     . . . The Courts in our state use the term 'standing' to refer generally to a party's right to have a court decide the merits of a dispute. A court may not properly exercise subject matter jurisdiction over the parties to an action unless the standing requirements are satisfied.

*Teague v. Bayer AG*, 195 N.C. App. 18, 22-23, 671 S.E.2d 550, 554 (2009) (citations

and quotation marks omitted).

In *Laurel Park Villas Homeowners Assoc. v. Hodges*, property owners sued

under the name of their homeowners association, and this Court affirmed the decision

to dismiss the suit for lack of standing:

> Plaintiff argues that the corporate bylaws expressly give it the power to bring this action. We agree that there is a provision in plaintiff's Articles of Incorporation that purports to give the corporation that power. However, a provision of the bylaws indicates that all powers of the corporation shall be exercised by the board of directors, and allows the board to designate officers. There is nothing in the articles or the bylaws authorizing persons other than the board, its officers, or the membership to act on behalf of the corporation, and nothing in the record suggesting that any of these authorized this action. In any event, the bylaws also provide that they are established in accordance with G.S. Chapter 47A, and that in case of conflict the statute shall control. Since the statute specifically designates who may sue to enforce the restrictions, it controls. We therefore hold that the court correctly determined that plaintiff lacked standing to prosecute this action.

82 N.C. App. 141, 143–44, 345 S.E.2d 464, 466 (1986). Here too plaintiffs failed to

comply with their own bylaws in bringing this action. *See id.*

Plaintiffs' final argument is that "[a]dministrative and procedural provisions, such as those contained in the Bylaws of the Associations, are nonjurisdictional, and do not bear upon the authority of the courts to hear and adjudicate [p]laintiff's claims." Plaintiffs contend that requiring compliance with bylaws is a "mere techincalit[y]" that "elevat[es] form over substance[.]" Although plaintiffs' boards of directors have more power to make decisions on behalf of the associations than just a general member, the members and the bylaws confer that power of each board of directors. The very purpose of plaintiffs' boards is to act on behalf of its members; a rogue board of directors taking actions outside of its bylaws is no more representative of the entity than a rogue member who has taken the same actions. For example, in *Beech Mountain Property Owners' Assoc v. Current*, property owners sued under the name of their homeowners association to enforce restrictive covenants. 35 N.C. App. 135, 135, 240 S.E.2d 503, 505 (1978). This Court addressed other matters unrelated to the issues in this case but also ultimately determined that

> [w]e are of the opinion that a strict construction of the provisions in the present case compels the conclusion that the plaintiff lacks the capacity to raise the issues in this suit. The plaintiff is a corporation and, as such, must be viewed as an entity distinct from its individual members.

*Id.* at 139, 240 S.E.2d at 507. The Court determined that the property owners had the right to sue, *not* the association, because the covenants in that case granted

> the right of enforcement of the restrictions to the owners of lots or any of them jointly or severally[.] And we must assume that if the grantor had intended to authorize the plaintiff [association] to enforce the provisions as an agent of the property owners, it would have expressed such intent.

*Id.* (quotation marks and ellipses omitted).

Here, plaintiffs failed to hold a meeting or take other action in accordance with their bylaws to authorize the filing of this lawsuit. In *Beech Mountain Property Owners' Assoc.*, and *Laurel Park Villas Homeowners Assoc.*, property owners sued on behalf of an association without the proper authorization of that association to take that action. *See Beech Mountain Property Owners' Assoc.*, 35 N.C. App. at 135, 240 S.E.2d at 505; *Laurel Park Villas Homeowners Assoc.*, 82 N.C. App. at 143-44, 345 S.E.2d at 466. Here, two boards sued on behalf of the associations also without the proper authorization to take that action. Such actions go far beyond "mere technicalities" and "elevating form over substance" as essentially a small portion of the association has taken the steps to speak for the whole. Both plaintiffs had specific bylaw provisions for how to handle issues such as this, and both ignored those provisions. In addition, plaintiffs have not presented any evidence that the boards took action in accord with their bylaws to ratify the filing of the lawsuit after the issue of standing was raised. This Court has no way of knowing the position the members of the homeowners' associations would actually take in this case as their representatives acted beyond the scope of their authority in disregarding their

bylaws.  Therefore, we affirm the trial court's decision to dismiss for lack of standing.

### III.    Conclusion

For the foregoing reasons, we affirm.

AFFIRMED.

Judge ELMORE concurs.

Judge DIETZ concurs in a separate opinion.

DIETZ, Judge, concurring.

I am not persuaded that an association's failure to comply with the authorization steps in its bylaws before bringing suit should be treated as a jurisdictional defect that can be raised by an opposing party at any time as a means to dismiss the action. Whether the procedural steps to authorize the suit were followed or not, these homeowners' associations appear to possess a "sufficient stake in an otherwise justiciable controversy" to confer jurisdiction on the trial court to adjudicate this legal dispute. *Peninsula Prop. Owners Ass'n, Inc. v. Crescent Res., LLC*, 171 N.C. App. 89, 92, 614 S.E.2d 351, 353 (2005). Moreover, the General Statutes and the association's bylaws provide means for association members harmed by the improper commencement of this suit to seek redress from the courts if they wish to do so—either by seeking to stay or dismiss the action, or by pursuing a separate action against the appropriate parties for the unauthorized filing of the lawsuit.

Permitting a defendant to question the association's standing to bring suit where no member of the association has objected is "akin to letting the proverbial fox protect the interests of the chickens." *Port Liberte II Condo. Ass'n, Inc. v. New Liberty Residential Urban Renewal Co., LLC*, 86 A.3d 730, 740 (N.J. Super. Ct. App. Div. 2014). But I am unable to distinguish this case from our Court's earlier holding in *Peninsula Property Owners Association*, which compels us to affirm the dismissal of this action for lack of jurisdiction. I therefore concur in the majority opinion.