Ehmann v. Medflow, Inc., 2017 NCBC 86.

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

EUGENE K. EHMANN;
N. WILLIAM SCHIFFLI, JR.; and
THAD A. THRONEBURG,

    Plaintiffs,

  v.

MEDFLOW, INC.; GREG E.
LINDBERG; ELI RESEARCH, LLC;
ELI GLOBAL, LLC; ELI EQUITY, LLC;
SNA CAPITAL, LLC; SOUTHLAND
NATIONAL HOLDINGS, LLC;
SOUTHLAND NATIONAL
INSURANCE CORPORATION;
DJRTC, LLC; and MEDFLOW
HOLDINGS, LLC,

    Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
15 CVS 3098

ORDER & OPINION DENYING
CROSS-MOTIONS FOR SUMMARY
JUDGMENT

1. THIS MATTER is now before the Court on six summary judgment motions: (1) Plaintiff N. William Schiffli, Jr.'s Motion for Partial Summary Judgment, filed April 1, 2016; (2) Plaintiff Thad A. Throneburg's Motion for Partial Summary Judgment, filed July 18, 2016; (3) Plaintiff Eugene K. Ehmann's Motion for Partial Summary Judgment, filed August 11, 2016; (4) Defendants' Motion for Summary Judgment Against Eugene K. Ehmann, filed November 15, 2016; (5) Defendants' Motion for Summary Judgment Against N. William Schiffli, Jr., filed November 15, 2016; and (6) Defendants' Motion for Summary Judgment Against Thad A. Throneburg, filed November 15, 2016 (collectively the "Motions"). For the reasons discussed below, the Court DENIES the Motions.

*Caudle and Spears, P.A., by Christopher P. Raab and Harold C. Spears, for Plaintiffs.*

*Condon Tobin Sladek Thornton PLLC, by Aaron Z. Tobin (pro hac vice), Kendal B. Reed (pro hac vice), John DeFeo (pro hac vice) and Jared T.S. Pace (pro hac vice), and Smith Moore Leatherwood, LLP, by C. Bailey King, Jr. and Matthew W. Krueger-Andes for Defendants.*

Gale, Chief Judge.

## I.    INTRODUCTION

2.    Plaintiffs Thad A. Throneburg ("Throneburg"), Eugene K. Ehmann ("Ehmann"), and N. William Schiffli, Jr. ("Schiffli") (collectively the "Plaintiffs") seek to recover benefits, including severance payments and a change-of-control bonus, provided for by their employment agreements with Defendant Medflow, Inc. ("Medflow").  Plaintiffs' employment agreements were entered into before Eli Global, LLC ("Eli Global"), a company controlled by Defendant Greg E. Lindberg ("Lindberg"), acquired Medflow.  Plaintiffs also challenge actions that Lindberg allegedly directed the other corporate defendants to undertake to avoid enforcement of Plaintiffs' security interests.  Defendants contest any liability under the employment agreements, contending first that the agreements were improper conflict-of-interest transactions and second that their terms are so unfair to Medflow as to be unenforceable.

3.    The Court severed for early trial the issue of whether Plaintiffs' employment agreements are binding and enforceable (the "Severed Issue").  Following discovery on the Severed Issue, the parties filed cross-motions for summary judgment.  As part of their motions, Plaintiffs argue that the Court need not reach

the merits of the underlying arguments, contending that no Defendant has standing to challenge the agreements because there are now no Medflow shareholders who owned shares at the time the employment agreements were executed. As to the underlying merits, the cross-motions present contested issues as to the proper legal standard to use to assess the enforceability of the employment agreements and whether the controlling legal standard has been met by these particular facts.

4. Except as narrowed by the Court's ruling on issues of law, the Court concludes that each of the Motions present contested issues of material fact and must, therefore, be denied.

## II. PROCEDURAL HISTORY

5. Plaintiffs initiated this action on February 18, 2015, and filed their Notice of Designation contemporaneously with their verified Complaint. This matter was designated a mandatory complex business case by order of Chief Justice Mark Martin on February 19, 2015, and assigned to the undersigned on February 20, 2015.

6. Plaintiffs filed a verified Amended Complaint on April 21, 2015, and with leave of court, filed a verified Second Amended Complaint on December 2, 2015.

7. Plaintiffs' Second Amended Complaint is 102 pages long, includes 696 separately numbered allegations and twelve causes of action. The central claim subject to the present Motions is Plaintiffs' efforts to enforce provisions of their employment agreements providing for a change-of-control bonus, unpaid wages, and severance benefits.

8. On December 4, 2015, Defendants moved to dismiss Plaintiffs' Second Amended Complaint.

9. On April 1, 2016, Schiffli filed his Motion for Partial Summary Judgment.

10. On July 18, 2016, Throneburg filed his Motion for Partial Summary Judgment, attaching his affidavits.

11. On August 11, 2016, Ehmann filed his Motion for Partial Summary Judgment, attaching his affidavits.

12. On September 13, 2016, the Court denied Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint as it related to Plaintiffs' breach of contract claims and reserved ruling on the other claims.

13. On September 19, 2016, the Court entered its order providing for an early trial on the Severed Issue, which will resolve whether the employment agreements were entered pursuant to a valid process and whether they can be voided because they are unfair to Medflow. The Court allowed initial discovery limited to the Severed Issue and set a deadline for summary judgment motions on that issue.

14. The Court also ordered that Defendants respond to the portion of the Second Amended Complaint relevant to the Severed Issue. On October 3, 2016, Defendants filed their response to the severed contract claim ("Answer").

15. On November 15, 2016, Defendants filed separate summary judgment motions against each Plaintiff on the Severed Issue, supported, in part, by affidavits

of former Medflow shareholders and directors. That same day, Defendants moved to strike the affidavits Plaintiffs filed in support of their motions.

16. Plaintiffs then moved to strike Defendants' supporting affidavits to the extent they expressed an opinion on the fairness of the employment agreements.

17. The Court heard oral argument on Plaintiffs' summary judgment motions on December 2, 2016, while briefing on Defendants' motions was in process.

18. On December 8, 2016, the Court allowed simultaneous supplemental briefing on issues raised at the December 2, 2016 hearing. The parties filed supplemental briefs on January 11, 2017.

19. On May 3, 2017, the Court heard oral argument on Defendants' motions for summary judgment and the related motions to strike. The Court also entertained supplemental argument on the matters addressed in the supplemental briefing noted above.

20. On June 14, 2017, the Court directed the parties to file further supplemental briefs on Plaintiffs' more recently raised contention that the contemporaneous ownership rule precludes any Defendant from having standing to challenge, or defend against, the enforceability of the employment agreements.

21. All of the Motions have now been fully briefed and argued and are ripe for determination.

### III. STATEMENT OF FACTS

22. The Court does not make findings of fact when ruling upon a motion for summary judgment. But to provide context for its ruling, the Court may state either

those facts that it believes are not in material dispute or those facts on which a material dispute forecloses summary adjudication. The following statement of facts is solely for the purpose of this Order & Opinion.

A.  **Medflow's Early History and the December 2013 Change in Management**

23.  Medflow was formed on January 28, 1999, as a provider of computer software for the medical industry. (Ehmann Aff. ¶ 9, Aug. 3, 2016.) At relevant times, Medflow's shareholders included its founder James Riggi ("Riggi"), Davlong Business Solutions, LLC ("Davlong"), controlled by David Long ("Long"), and other minority shareholders. (Riggi Aff. ¶¶ 3, 6; Long Aff. ¶ 5.)

24.  Ehmann and Throneburg first became Medflow shareholders in 2004. (Throneburg Aff. ¶ 26, July 5, 2016; Ehmann Aff. ¶ 10, Aug. 3, 2016.) Throneburg served as Medflow's CEO from January 1, 2005, to November 2007. (Throneburg Aff. ¶ 27, July 5, 2016.) In late 2007, Throneburg sold his approximate 24% ownership interest to Davlong and returned to active law practice in Charlotte, North Carolina. (Throneburg Aff. ¶¶ 26, 38, 42, July 5, 2016.)

25.  Following Throneburg's departure, Riggi became CEO. (Ehmann Aff. ¶ 15, Aug. 3, 2016.)

26.  In November 2009, Ehmann accepted a position as Medflow's director of human resources. (Ehmann Aff. ¶ 18, Aug. 3, 2016.)

27.  Schiffli joined Medflow in 2010 as its Chief Financial Officer. He was hired as an independent contractor rather than as an employee. (*See* Schiffli Aff. ¶ 2, Mar. 16, 2015; Throneburg Aff. ¶ 107, July 15, 2016.)

28.     In the fall of 2013, shareholders controlling a majority of Medflow shares discussed their dissatisfaction with Riggi's leadership. (*See* Ehmann Aff. ¶ 24, Aug. 3, 2016.)  On October 8, 2013, those shareholders entered a voting agreement and irrevocable proxy that gave Davlong the right to vote for the majority of shares on most issues. (*See* Ehmann Aff. ¶ 26, Aug. 3, 2016.)  By December 6, 2013, the parties to the voting agreement had resolved to ask Throneburg to return to Medflow as its CEO. (Ehmann Aff. ¶ 29, Aug. 3, 2016.)  On or before December 10, 2013, Throneburg agreed to return as CEO on a ninety-day interim basis. (Ehmann Aff. ¶ 30, Aug. 3, 2016.)

29.     On December 10, 2013, the shareholders met and voted to terminate all of Medflow's current officers, including Schiffli; to oust Riggi from management; to hire Throneburg as interim CEO; to elect Ehmann as Vice President, Treasurer, and Secretary; to limit Medflow's board to a single director; and to elect Ehmann as that sole director. (*See* Ehmann Aff. ¶ 39, Aug. 3, 2016; Throneburg Aff. Ex. 3, July 18, 2016.)

30.     Although Schiffli was terminated as an officer, he continued to serve as Medflow's chief financial officer as an independent contractor. (*See* Throneburg Aff. ¶ 55; *see also* Throneburg Aff. Ex. 3, at 3.)

**B.     Medflow's Senior Management Team and the New Strategic Plan**

31.     After December 10, 2013, Throneburg, Ehmann, and Schiffli were three of the four members of Medflow's senior management team; the fourth member, James Messier, is not a party to the litigation. (Throneburg Aff. ¶ 68, July 15, 2016.)

32.     Plaintiffs assert, and Defendants deny, that the senior management team adopted a multi-year strategic plan early in the first quarter of 2014 that focused on moving Medflow's software platform from a server-based system to a cloud-based system ("Strategic Plan"). (Ehmann Aff. ¶ 44, Aug. 3, 2016; Throneburg Aff. ¶¶ 75–76, July 15, 2016.) Plaintiffs assert that the Strategic Plan required securing management personnel with multi-year contracts.

33.     At his deposition, Throneburg testified that immediately after returning as CEO, he recognized that Ehmann and Schiffli were essential members of Medflow's senior management team. (Throneburg Aff. ¶¶ 104, 108–09, July 15, 2016.) In early 2014, before negotiating the employment agreements, Throneburg authorized a significant pay increase for Ehmann—changing Ehmann's compensation from $52.50 per hour to an annual salary of $165,000—which Throneburg asserts was accompanied by Ehmann's increased duties. (Ehmann Dep. 72:5–20, Sept. 28, 2016; Throneburg Aff. ¶¶ 103–105, July 15, 2016.) Throneburg also adjusted Schiffli's compensation as an independent contractor to $165,000 annually. (Throneburg Aff. ¶ 113, July 15, 2016.)

**C.     Throneburg Negotiates His Employment Agreement with Ehmann**

34.     Plaintiffs maintain that Throneburg first negotiated the essential terms of his employment agreement with Ehmann before there was any expectation that Throneburg would in turn negotiate a contract between Medflow and Ehmann, meaning that Ehmann was able to represent Medflow as a disinterested director. (Throneburg Aff. ¶ 87, July 15, 2016; Ehmann Aff. ¶¶ 54, 57, Aug. 3, 2016.)

35.     The record is unclear as to exactly when Throneburg first began negotiating his contract, but he testifies that he and Ehmann reached an agreement in principle on all essential terms by March 1, 2014.  (Throneburg Aff. ¶ 85, July 15, 2016.)  The contract was not reduced to writing until July 2014 and at least one material term was changed in July 2014. (Throneburg Aff. ¶¶ 139, 142, July 15, 2016.)

## D.     Ehmann Delegates Board Authority to Throneburg

36.     Throneburg contends that, after the terms of his employment agreement as CEO were verbally agreed to, he then began negotiating employment agreements with Ehmann and Schiffli on behalf of Medflow's board, pursuant to authority delegated to him by Ehmann.

37.     Medflow's bylaws provide that "[a]ll corporate powers shall be exercised by or under the authority of, and the business and affairs of the corporation shall be managed under the direction of, the Board of Directors."  (Throneburg Aff. Ex. 2 ("Bylaws") Article III, Section 1, July 5, 2016.)  Compensation of all officers is under the authority of the board, and any officer compensation must be "duly authorized." (Bylaws Article V, Section 3.)

38.     The bylaws allow the board to "authorize any officer or officers, agent or agents, to enter into any contract or execute and deliver any instrument in the name of and on behalf of the corporation." (Bylaws Article VI, Section 1.)  Medflow's bylaws allow its board to take action either at a duly called meeting or without a meeting, provided that action taken without a meeting "must be evidenced by one or more

written consents signed by each director before or after such action, describing the action taken, and included in the minutes or filed with the corporate records." (Bylaws Article IV, Section 8.)

39.     Throneburg and Ehmann testified that after negotiations on Throneburg's contract were complete, Ehmann orally delegated to Throneburg the board's authority to secure such additional employment contracts as Throneburg, in his discretion, deemed necessary to effectuate the Strategic Plan. (Ehmann Aff. ¶ 61, Aug. 3, 2016; Throneburg Aff. ¶ 94, July 15, 2016.) Ehmann testified that he relied on Throneburg's advice that Medflow's bylaws allow for such a delegation. (Ehmann Aff. ¶ 62, Aug. 3, 2016; *see also* Throneburg Aff. ¶ 95, July 15, 2016.) At the time, the delegation was not reduced to writing.

## E.     Throneburg Negotiates Employment Agreements with Ehmann and Schiffli

40.     Throneburg testified that he pursued negotiations for contracts with Ehmann, Messier, and Schiffli, based on this delegated authority. (*See* Throneburg Aff. ¶¶ 102, 104–05, 112–14, July 15, 2016.) Throneburg first negotiated with Ehmann, reaching an agreement in principle on the essential terms for Ehmann's service as Vice President by April 1, 2014. (Throneburg Aff. ¶ 105, July 15, 2016; Second Am. Compl. Ex. 7 ("Ehmann Contract") ¶ H.) Ehmann's written contract was executed on July 7, 2014, but reflected an effective date of April 1, 2014. (Ehmann Contract 1; Throneburg Aff. ¶ 142, July 15, 2016.)

41.     Throneburg then negotiated Schiffli's agreement, which was effective as of July 1, 2014. (Second Am. Compl. Ex. 8 ("Schiffli Contract"), at 1.) The contract

terms provided that Schiffli would remain an independent contractor through December 31, 2014, but would become an employee, without further action, on January 1, 2015. (Schiffli Contract ¶ I.)

## F.     Throneburg Drafts the Employment Agreements

42.     Ehmann directed Throneburg to prepare the written agreements. Ehmann had confidence, "[b]ased upon [his] knowledge of previous employment agreements, other contracts[,] and other documents Mr. Throneburg had drafted for Medflow and others, . . . that Mr. Throneburg had drafted employment agreements which met all the necessary legal requirements and were consistent with arm's length transactions under the circumstances." (Ehmann Aff. ¶ 91, Aug. 3, 2016.)

43.     Throneburg primarily drafted the agreements over the July 4, 2014 holiday, utilizing information that his legal assistant had gathered for him, as well as contracts he had negotiated in law practice. (Throneburg Aff. ¶¶ 123–29, July 18, 2016.)

44.     When negotiating initial terms, Throneburg and Ehmann had agreed to a two-year severance provision. After discussions on July 5, 2014, Throneburg and Ehmann agreed that they should each add a change-of-control bonus in exchange for limiting the severance payment to one year. (*See* Throneburg Aff. ¶ 139, July 15, 2016; Ehmann Aff. ¶ 88, Aug. 3, 2016.)

45.     Throneburg then finalized the written agreements. Defendants have argued that the agreements were improperly backdated. The record appears clear that each of the agreements was executed on July 7, 2014, but reflect an earlier

effective date based on the alleged date the terms of the oral agreement had been finalized. (Throneburg Aff. ¶ 142, July 15, 2016.)

46. Ehmann executed Throneburg's agreement as Medflow's representative. (*See* Throneburg Aff. ¶ 86, July 15, 2016.) Throneburg executed Ehmann's and Schiffli's agreements as Medflow's representative. (*See* Throneburg Aff. ¶¶ 105, 114, July 15, 2016.)

47. Neither Throneburg nor Ehmann consulted with Medflow's regular outside corporate counsel, Dain Dulaney, Jr. ("Dulaney"), before executing the employment agreements. (Throneburg Aff. ¶ 141, July 18, 2016; Ehmann Aff. ¶ 89, Aug. 3, 2016.) Throneburg explains that "the drafting and the terms of the employment agreements were well within [his] experience and professional competence and . . . [he] attempted to minimize outside professional fees where possible." (Throneburg Aff. ¶ 141, July 18, 2016.)

48. The existence and terms of the employment agreements were first disclosed to Medflow's controlling shareholders when the agreements were produced in this litigation. (*See* Long Aff. ¶ 9; Riggi Aff. ¶ 10.)

## G. The Essential Terms of the Employment Agreements

49. The material terms of each of the agreements vary only in regard to the respective title, salary, and effective date. (*See* Second Am. Compl. Ex. 6 ("Throneburg Contract"); Ehmann Contract; Schiffli Contract.) Throneburg's salary was $360,000 per year as CEO, Ehmann's salary was $165,000 per year as Vice President, and Schiffli's salary was $165,000 per year as CFO. (Throneburg Contract ¶ 10; Ehmann Contract ¶ 10; Schiffli Contract ¶ 10.) Each agreement provides that

it shall be governed by North Carolina law. (Throneburg Contract ¶ 30; Ehmann Contract ¶ 30; Schiffli Contract ¶ 30.)

50. The three agreements share the following terms:

- A three-year initial term, followed by one-year automatic renewals, absent notice of termination (*see, e.g.*, Throneburg Contract ¶ 5);

- Protection for the employee against a reduction in the employee's base salary (*see, e.g.*, Throneburg Contract ¶ 10);

- Employee's potential eligibility for increased base salary or bonuses (*see, e.g.*, Throneburg Contract ¶ 10);

- A right for the employee to terminate the agreement upon thirty-days' notice for any reason, with forfeiture of severance and other benefits should the employee terminate without "Good Reason," (*see, e.g.*, Throneburg Contract ¶¶ 6, 9(b));

- A right for the employee to receive severance and other benefits if the employee terminates the agreement upon thirty-days' notice for "Good Reason," which is defined to include a breach by Medflow, removal of the employee from the position to which he was hired, or the employee's own good faith determination—binding on Medflow—that an adverse change in the employment relationship has occurred (*see, e.g.*, Throneburg Contract ¶¶ 8, 9(a)(ii));

- A right for Medflow to terminate the employee for "Cause" only if the employee (1) engages in unauthorized conduct causing "demonstrable and serious damage to Medflow," (2) is convicted of a felony, or (3) unreasonably neglects or refuses to perform his duties, and the reason for termination is established by a final judicial proceeding (*see, e.g.*, Throneburg Contract ¶ 7);

- A right for the employee to receive "one (1) times [the employee's] Annual Base Salary," payable in twelve monthly installments as severance pay for any termination by the employee for "Good Reason" or by Medflow without "Cause" (*see, e.g.*, Throneburg Contract ¶ 9(a)(i));

- A right for the employee to receive an accelerated immediate payment of the employee's entire severance pay in the event of a "Change of Control" (*see, e.g.*, Throneburg Contract ¶ 9(c));

- A right for the employee to receive three years of medical and dental insurance coverage as a severance benefit unless the employee was terminated for "Cause" (*see, e.g.*, Throneburg Contract ¶ 9(a)(ii));

- A right for the employee to receive a bonus payment in the event of a "Change of Control," equal to one year's salary plus an additional "gross-up payment," unless the employee

terminates without "Good Reason" or Medflow terminates for "Cause" prior to the "Change of Control" (*see, e.g.*, Throneburg Contract ¶ 9(c)); and

- A security interest for the employee in all of Medflow's tangible and intangible personal property to secure Medflow's payment obligations. (Throneburg Contract ¶ 24; Ehmann Contract ¶ 24; Schiffli Contract ¶ 24.)

## H. Ehmann Later Ratifies the Employment Agreements

51. Ehmann executed a Written Consent of Director to Action In Lieu of a Meeting ("Written Consent"), dated December 9, 2014. (Ehmann Aff. Ex. 3 ("Written Consent"), Aug. 3, 2016.) The Written Consent reflects that Ehmann had taken action as sole director, *inter alia,* to elect Throneburg as President/Chief Executive Officer, himself as Vice President/Secretary, and Schiffli as Treasurer/Chief Financial Officer, to approve the Strategic Plan, and to ratify each of Plaintiffs' employment contracts as of their effective date. (Written Consent 1–3.) The Written Consent did not explicitly refer to Ehmann's verbal delegation to Throneburg to exercise duties on behalf of the board of directors.

52. It is not clear if the Written Consent was actually signed on December 9, 2014, or later. Throneburg testified that the Written Consent was prepared in contemplation of an upcoming shareholders' meeting to be held on December 19, 2014. (Throneburg Aff. ¶ 141, July 15, 2016.) On December 10, 2014, Throneburg emailed Medflow's outside counsel, Dulaney, an unsigned draft of the Written

Consent as well as the employment agreements. (Throneburg Aff. ¶ 141, July 15, 2016.)

53. Dulaney reviewed the employment agreements, and on December 11, 2014, sent Throneburg an e-mail, stating, in part:

> I am also struggling to determine who should approve [Ehmann's] Employment Agreement because he cannot approve his own Employment Agreement as the Sole Director, since that is a clear conflict of interest. You cannot approve it since he gave one to you. That leaves me at the point where I believe the correct course of action would be to get the Shareholders to approve it at the Annual Meeting.

(Dulaney Aff. Ex. 1B.)

54. The employment agreements were neither submitted nor discussed at the December 19 shareholders' meeting. Riggi and Long testified that they first became aware of the employment agreements after this litigation was initiated. (Riggi Aff. ¶¶ 10–12; Long Aff. ¶¶ 9–10.) Long states that he would not have approved the agreements if requested to do so as a shareholder. (Long Aff. ¶ 13.)

55. Dulaney also raised concerns that Throneburg, Ehmann, and Schiffli had not executed non-competition agreements. (Dulaney Aff. Ex. 1B.) In December 2014, Plaintiffs each executed new non-competition agreements, which were retroactive to the effective date of their employment agreements. (Throneburg Aff. ¶¶ 151–52, July 15, 2016.)

## I.    Lindberg's Entities Acquire Medflow

56. To address Plaintiffs' standing argument, the Court assumes the allegations in the Second Amended Complaint correctly outline the details regarding Eli Global's ultimate acquisition of all of Medflow's shares by January 18, 2015.

57.    In August 2014, Riggi formed DJRTC, LLC ("DJRTC"), to which he then transferred his Medflow shares.  (*See* Second Am. Compl. ¶ 242; Answer ¶ 242.)  On September 5, 2014, Riggi gave notice of this transaction to Medflow, contending that the transaction was authorized by the shareholders' agreement.  (*See* Second Am. Compl. Exs. 14, 15.)  Plaintiffs challenged the validity of this transfer and did not honor Riggi's request to record the transfer on Medflow's books.  (*See* Am. Compl. Ex. 16.)

58.    After the share transfer, Riggi sold DJRTC to SNA Capital, LLC ("SNA"), an affiliate of Eli Global, which Lindberg owns or controls.  (*See* Second Am. Compl. Ex. 14.)

59.    Lindberg met with Medflow's senior management team on September 18, 2014, and advised Plaintiffs that he intended to acquire all of Medflow's shares. (Second Am. Compl. ¶¶ 289–90(a); *see* Second Am. Compl. Ex. 16, at 1.)  Plaintiffs allege that Lindberg, at that same time, initiated an illegal tender offer to Medflow's shareholders.  (Second Am. Compl. ¶¶ 260–63; *see* Second Am. Compl. Ex. 16, at 2.)

60.    On December 18, 2014, Eli Global contracted to buy Davlong's Medflow shares.  (Second Am. Compl. Ex. 18.)

61.    On December 19, 2014, Lindberg and David Long attended Medflow's annual shareholder meeting.  (Second Am. Compl. ¶¶ 297–98.)  Plaintiffs argue Lindberg attended as a proxy.  (*See* Second Am. Compl. ¶¶ 297–98.)  Defendants contend Lindberg attended as a representative of DJRTC—the new beneficial owner of Medflow shares.

62.     Lindberg was elected as Medflow's sole director at the December 19 meeting.  (Second Am. Compl. ¶ 302.)

63.     By January 16, 2015, Lindberg had acquired ownership of all Medflow shares through his company Eli Global.  (*See* Second Am. Compl. ¶ 325.)

64.     On January 16, 2015, Eli Global transferred all Medflow's stock to DJRTC.  (Second Am. Compl. Ex. 20.)

## J.     Lindberg Did Not Learn of the Employment Agreements Before Acquiring Medflow.

65.     Lindberg and his companies completed limited due diligence in connection with their acquisition of Medflow.  They did not ask for copies of Plaintiffs' employment agreements before completing the acquisition.  (Second Am. Compl. ¶¶ 345–46.)   Eli Global executed a non-disclosure agreement with Medflow on December 31, 2014, after which there was a limited exchange of Medflow's corporate information.  (Second Am. Compl. ¶ 345.)

66.     Lindberg first became aware of the employment agreements on January 23, 2015.  (Second Am. Compl. ¶ 356; Answer ¶ 356.)

## K.     Termination of the Employment Agreements

67.     Plaintiffs contend that a "Change of Control," as defined by the employment agreements, occurred no later than January 16, 2015.  (Second Am. Compl. ¶ 336.)

68.     On or about January 19, 2015, Schiffli, acting as Medflow's CFO, calculated and recorded the change-of-control payments due to Plaintiffs as a Medflow current liability.  (Second Am. Compl. ¶ 338.)

69.    On January 22, 2015, Eli Global representatives visited Medflow's offices, at which time Schiffli provided them with the change-of-control payment calculations and copies of the employment agreements. (Second Am. Compl. ¶¶ 347–48; Answer ¶ 348.)

70.    In February 2015, Plaintiffs filed this litigation and attempted to perfect their UCC security interests, but contend that Defendants had already taken action to thwart their security interests in Medflow's assets.

71.    Plaintiffs contend that they were placed on administrative leave, but that they fully cooperated with Eli Global until they were purportedly terminated for "Cause" on May 1, 2015. Plaintiffs contend that this termination was ineffective because it was not for "Cause," as defined by the employment agreements. Rather, Plaintiffs contend that they terminated their employment for "Good Reason" on September 3, 2015.

72.    Plaintiffs contend that their termination for "Good Reason" triggers their entitlement to severance compensation.

73.    In addition to denying that Plaintiffs terminated their agreements for "Good Reason," Defendants contend that payments provided for by the agreements are not owed to Plaintiffs because the agreements are unfair to Medflow and include terms that are unconscionable.

## L.    Affidavits Filed in Connection with the Motions

74.    Plaintiffs filed Kevin Walker's affidavit when they filed their motions for partial summary judgment. Mr. Walker, a certified public accountant, opines that

the terms of the employment agreements are fair to Medflow. (Walker Aff. ¶¶ 12–13.) Later, Plaintiffs filed an expert affidavit of Thomas B. Henson in opposition to Defendants' motions for summary judgment. Mr. Henson opines that the terms of the agreements are substantively fair to Medflow but he expressly states that he does not have an opinion regarding the process by which the agreements were entered. (Henson Aff. ¶¶ 24–25.)

75. Defendants object to the use of Mr. Henson's affidavit in support of Plaintiffs' motions, but acknowledge that it may be considered in opposition to Defendants' motions.

76. Defendants filed Riggi's and Long's affidavits with their motions for summary judgment. Riggi and Long each state that they were not aware of the employment agreements while they were Medflow shareholders. (Long Aff. ¶ 9; Riggi Aff. ¶ 11.) Additionally, Long opines that the terms of the agreements are unfair to Medflow and that he would not have approved the agreements had he been asked to do so as the majority shareholder. (Long Aff. ¶¶ 13–14.)

77. Plaintiffs object to these affidavits on the basis that Long is not competent to express an opinion on whether the employment agreements are fair and that neither Long nor Riggi were identified in Defendants' Response to Plaintiffs' First Set of Interrogatories, which requested that Defendants identify persons who had knowledge or facts regarding the action. (Pls.' Br. Supp. Mot. Strike and Exclude *in Limine* Affs. of David Long and James Riggi 1–3.)

78. Without ruling on the ultimate admissibility of the testimony reflected in the affidavits, the Court, in its discretion, now denies the motions to strike. (*See* Tr. 5:2–10, May 3, 2017.)

## IV. STANDARD OF REVIEW

79. Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. Gen. Stat. § 1A-1, Rule 56(c) (2015). "Summary judgment is improper if any material fact is subject to dispute." *Culler v. Hamlett*, 148 N.C. App. 389, 391, 559 S.E.2d 192, 194 (2002). The movant bears the burden of proving the lack of a triable issue. *Dalton v. Camp*, 353 N.C. 647, 651, 548 S.E.2d 704, 707 (2001). Once the movant has met that burden, the burden shifts to the nonmoving party to produce a forecast of evidence that demonstrates facts showing that it can establish a prima facie case at trial. *Austin Maint. & Constr., Inc. v. Crowder Constr. Co.*, 224 N.C. App. 401, 407, 742 S.E.2d 535, 540 (2012). The Court must view all the presented evidence in the light most favorable to the nonmoving party. *Dalton*, 353 N.C. at 651, 548 S.E.2d at 707.

## V. ANALYSIS

80. The cross-motions raise multiple issues. First, Plaintiffs contend that no Defendant, including Medflow itself, has standing to challenge or defend against the enforceability of the employment agreements because no Defendant was a Medflow shareholder on or before July 7, 2014, when the agreements were executed.

Assuming standing, the parties disagree as to the legal standard the Court should use to determine if the employment agreements may be voided as conflict-of-interest transactions. Finally, assuming the agreements are not voided, Defendants contend that the agreements are nevertheless unenforceable, in whole or in part, because the terms are so unfair to Medflow as to be unconscionable and constitute corporate waste.

## A. *Park Terrace* and the Contemporaneous Ownership Rule Do Not Preclude Judicial Review of the Employment Agreements

81. Plaintiffs contend that Defendants do not have standing to challenge the agreements because the contemporaneous ownership rule, under the facts of this case, should extend to Medflow as well as its current shareholders. The particular facts of this case raise the interesting and unsettled issue as to whether that rule applies not only to bar an affirmative claim but also to bar a defense against a claim by a former officer or director and relieve that officer or director from the burden of demonstrating that an interested transaction was fair to the corporation.

82. The contemporaneous ownership rule is generally understood to provide that a shareholder bringing a derivative action must have been a shareholder at the time of the wrong on which the action is based. Plaintiffs contend the rule should also bar the corporation from asserting a direct claim or an affirmative defense if none of the current shareholders owned shares at the time the wrong occurred. The issue of defendants standing affects the Court's subject matter jurisdiction. *See Aubin v. Susi*, 149 N.C. App. 320, 324, 560 S.E.2d 875, 878 (2002). Standing is an issue that can be challenged at any time, may be raised by the Court *ex mero motu*, and must

be addressed before the merits. *See Willowmere Cmty. Ass'n v. City of Charlotte*, ___ N.C. App. __, 792 S.E.2d 805, 808 (2016), *discretionary review granted*, ___ N.C.___, 795 S.E.2d 214 (2017); *In re T.B.*, 200 N.C. App. 739, 742, 685 S.E.2d. 529, 531–32 (2009); *Crouse v. Mineo & Crouse, PLLC*, 189 N.C. App. 232, 236, 658 S.E.2d 33, 36 (2008). The burden of establishing standing rests with the party invoking jurisdiction. Here, Plaintiffs seek to use a standing rule to preclude Defendants from asserting a defense to Plaintiffs' claims as well as a counterclaim, which recasts the defense as a claim for declaratory judgment. *See Neuse River Found. v. Smithfield Foods, Inc.*, 155 N.C. App. 110, 113, 574 S.E.2d 48, 51 (2002); *Queen's Gap Cmty. Ass'n v. McNamee*, 2011 NCBC LEXIS 37, at *4 (N.C. Super. Ct. Sept. 23, 2011).

83.     Plaintiffs contend that Defendants' standing is defeated by the rule adopted by the Supreme Court of North Carolina in *Park Terrace, Inc. v. Burge*, 249 N.C. 308, 106 S.E.2d 478 (1959), and the statutory contemporaneous ownership rule, codified in section 55-7-41 of the North Carolina General Statutes. Specifically, Plaintiffs contend that to have standing under *Park Terrace* and section 55-7-41 a shareholder must have been a shareholder at the time of the wrong complained of, and where there is no such shareholder, the corporation likewise lacks standing to complain of prior acts of its officers or directors.

84.     Defendants first contend that the continued vitality of the holding in *Park Terrace* is in doubt because the subsequent enactment of section 55-7-41 bars only suits by new shareholders and does not expressly include any provision barring a suit by the corporation itself. Second, Defendants contend that the *Park Terrace*

holding has not been, and should not be, applied to preclude a corporation from raising a defense to a claim instituted by its former officers or directors. Third, Defendants contend that even if the *Park Terrace* holding were to be applied, the contemporaneous ownership requirement is satisfied here because the Plaintiffs' employment agreements were not effective until they were ratified in writing by board action on December 9, 2014, by which time Defendant DJRTC had acquired a beneficial interest in Medflow.

85.    The North Carolina courts have sparingly cited the *Park Terrace* decision since it was issued in 1959. The Court must now interpret and apply *Park Terrace* without the benefit of any significant subsequent precedent.

**(1)    The Statutory Contemporaneous Ownership Rule**

86.    The statutory contemporaneous ownership rule embodied in section 55-7-41 of the North Carolina General Statutes limits a shareholder's standing to bring a derivative action to one who either "[w]as a shareholder of the corporation at the time of the act[s] or omission[s] complained of or became a shareholder through transfer by operation of law from one who was a shareholder at that time." N.C. Gen. Stat. § 55-7-41(1) (2015). The statute does not expressly address a corporation's standing to bring a direct action in its own right nor does it address a corporation's right to assert an affirmative defense.

87.    In *Park Terrace v. Burge* the Supreme Court of North Carolina concluded, based on the facts before it, that a corporation did not have standing to challenge breaches of fiduciary duty by its former officers where the claim would only

benefit the corporation's current shareholder, who was not a shareholder when the contested acts occurred. 249 N.C. 308, 315, 106 S.E.2d 478, 483 (1959). One leading treatise characterizes the holding in *Park Terrace* as no more than the application of the contemporaneous ownership rule before it was codified. *See* Russell M. Robinson, II, *Robinson on North Carolina Corporation Law* § 17.04, at 17-19 (7th ed. 2016). However, it appears that there was more at issue in the court's decision.

88.     The *Park Terrace* holding rested on equitable principles and was heavily influenced by an often-cited Nebraska Supreme Court opinion authored by Dean (then Commissioner) Roscoe Pound, which explained that

> "[w]hen the corporation comes into equity and seeks equitable relief, [the court] ought to look at the substance of the proceeding, and, if the beneficiaries of the judgment sought have no standing in equity to recover, [the court] ought not to become befogged by the fiction of corporation individuality, and apply the principles of equity to reach an inequitable result."

249 N.C. at 315, 106 S.E.2d at 483 (quoting *Home Fire Ins. Co. v. Barber,* 93 N.W. 1024, 1033 (Neb. 1903)) (internal citations omitted). Based on that equitable principle, the Supreme Court of North Carolina held that

> [i]n view of the fact that none of the present stockholders of the plaintiff corporation was a stockholder at the time of the transactions of which the plaintiff complains; the further fact that they obtained their shares through voluntary purchase or transfer, and not by operation of law, and since the action was not brought [o]n behalf of creditors or for the purpose of 'asserting or endeavoring to protect a title to property,' but solely as a suit in equity as [a] representative of its stockholders, it cannot be maintained.

*Id.* (quoting *Home Fire Ins. Co.,* 93 N.W. at 1033) (internal citations omitted).

**(2)** **The Trio of Cases Before the Supreme Court of North Carolina Arising From the Park Terrace Project**

89.     In addition to its 1959 decision in *Park Terrace*, on which Plaintiffs base their standing argument, the Supreme Court of North Carolina issued two earlier opinions in cases arising from the same facts—(1) *Lester v. McLean*, 242 N.C. 390, 87 S.E.2d. 886 (1955) ("*Lester*"), and (2) *Park Terrace, Inc. v. Phoenix Indemnification Co.*, 241 N.C. 473, 85 S.E.2d 677 (1955) ("*Phoenix*"). The two earlier opinions are instructive on how to read and apply *Park Terrace v. Burge*.

90.     Park Terrace, Inc. was formed to construct and own a low-income housing project financed by the Federal Housing Administration ("FHA"). *Park Terrace, Inc.*, 249 N.C. at 309, 106 S.E.2d at 479. Park Terrace contracted with Park Builders, Inc. to construct the project. *Phoneix*, 241 N.C. at 475, 85 S.E.2d at 677–78. Lawson Lester, Jr. and R.G. Burge owned shares in both Park Terrace and Park Builders. *See id.*, 85 S.E.2d at 678. Park Terrace issued three classes of stock—A, B, and preferred. *Park Terrace, Inc.,* 249 N.C. at 309–310, 106 S.E.2d at 479–80. The preferred stock, which did not include ownership rights, was issued to the FHA so it could assume control of the project if the mortgage was not paid. *Id.* at 310, 106 S.E.2d at 480. The Class B shares were issued at $1 par value. *Id.* at 311, 106 S.E.2d at 480. The Class B holders issued notes to the company for the shares, but never made any cash payments. *Id.* at 309, 106 S.E.2d at 479.

91.     Through a series of transactions, Lester and Burge acquired all of Park Terrace's Class B shares and owed the company $123,291 on notes issued in

connection with the purchase of those shares. *Id.* at 310, 106 S.E.2d at 479–80. On November 4, 1950, Lester and Burge sold all the Class B stock to Park Terrace for more than its par value. *Id.* at 310–11, 106 S.E.2d at 480. Lester and Burge voted as Class A shareholders to approve this sale. *Id.*

92. On February 15, 1951, M.P. McLean, Jr. acquired all of Park Terrace's Class A Stock from Lester and Burge. *Id.* at 311, 106 S.E.2d at 480. During negotiations, McLean, Lester, and Burge discussed the value of equity Lester and Burge had in the Park Terrace project as measured by the project's value less the outstanding mortgage. *See Lester*, 242 N.C. at 395, 87 S.E.2d at 890. McLean issued purchase notes to Lester and Burge. *Id.* at 391, 87 S.E.2d at 887.

93. In *Phoenix,* Park Terrace, then wholly owned by McLean, asserted claims against Park Builders and its surety for improper construction. 241 N.C. at 475–76, 85 S.E.2d at 678. As part of his purchase of Park Terrace, McLean individually entered into a settlement agreement with Lester and Burge, as Park Builders' shareholders, that included a general release of claims against Park Builders, Lester, and Burge. *Id.* at 475, 85 S.E.2d at 678. The court held that McLean's individual release did not bind Park Terrace because, when signing the release, McLean was not a shareholder or a representative of Park Terrace. *Id.* at 477–78, 85 S.E.2d at 679–80.

94. In *Lester,* Lester and Burge brought suit against McLean individually to enforce the purchase notes McLean had executed. 242 N.C. at 391, 87 S.E.2d at 887. McLean defended on the basis that he had been fraudulently induced by Lester

and Burge's misrepresentation as to the value of their equity in the Park Terrace project. *Id.* The court rejected the defense, finding that McLean had the ability to learn of the alleged misrepresentation because "he had unlimited opportunity to inspect the property." *Id.* at 400, 87 S.E.2d at 893.

95. In *Park Terrace, Inc. v. Burge*, Park Terrace, owned by McLean, filed suit to recover the money Park Terrace had paid Burge and Lester to purchase their Class B shares. *See* 249 N.C at 312–13, 106 S.E.2d at 481. The court held that, at the time of the suit, Park Terrace was acting as the representative of its shareholder, McLean, rather than for its own independent right and any recovery would essentially reduce the price McLean paid for his shares. *Id.* at 313, 106 S.E.2d at 482. The court then rejected the corporation's right to assert its claim.

96. The three opinions read together demonstrate that there were multiple factors that influenced the court's holding in *Park Terrace, Inc. v. Burge*. First, the court assumed, without deciding, that the corporation's purchase of Lester and Burge's Class B shares was an unfair transaction, stating "[i]t is difficult to understand how the payment of $221,000 for the purchase and retirement of this stock could have been for the best interest of the plaintiff corporation." *Id.* at 312, 106 S.E.2d at 481. However, the unfairness of this transaction was not controlling. Second, the court noted that all of Park Terrace's shareholders had approved the transaction, including those shareholders from whom McLean acquired his rights, leading the court to opine that "neither the plaintiff corporation nor the holders of the A stock could thereafter attack the validity of the transaction unless the corporation

in doing so was acting on behalf of creditors." *Id.* This supports the generally accepted view that a purchaser has no greater rights than his seller had. Third, McLean acquired his Class A shares voluntarily with the benefit of due diligence, suggesting that the court was influenced by McLean's failure to protect his rights. *Id.* at 315, 106 S.E.2d at 483; *see Lester*, 242 N.C. at 395–97, 87 S.E.2d at 890–91. Fourth, McLean's valuation of Park Terrace's Class A shares was made after the Class B share redemption had been completed. This raised the court's concern that allowing Park Terrace to recover the purchase price of the Class B shares would effectively reduce McLean's purchase price. *Park Terrace, Inc.*, 249 N.C. at 313, 106 S.E.2d at 482; *see Lester*, 242 N.C. at 394, 87 S.E.2d at 888. Finally, neither the FHA nor any creditor challenged the transaction. *Park Terrace, Inc.*, 249 N.C. at 311–12, 106 S.E.2d at 480–81.

### (3) The Nebraska Supreme Court Opinion—*Home Fire Insurance Co. v. Barber*

97. There is little subsequent North Carolina case law citing *Park Terrace*, *Phoenix*, or *Lester*. However, the Nebraska Supreme Court's opinion, *Home Fire Insurance Co. v. Barber*, which our Supreme Court relied on heavily in *Park Terrace*, has been widely cited and adopted. *See, e.g.*, *Bangor Punta Operations, Inc. v. Bangor & A.R. Co.*, 417 U.S. 703, 710–11 (1974); *Molina v. Sovereign Camp, W.O.W.*, 6 F.R.D. 385, 401 (Dist. Neb. 1947); *Eisler v. E. States Corp.*, 35 A.2d 118, 120 (Md. 1943).

98. In *Home Fire Insurance*, the corporation brought suit against its former officer, who had sold his shares to the corporation's new owner. *Home Fire Ins. Co.*, 67 Neb. at 645–47. The Nebraska Supreme Court categorized the corporation's

claims into two distinct categories: (1) claims to recover damages for the officer's mismanagement, and (2) claims to recoup monies the officer had withdrawn in connection with his claim for back salary. *Id.* at 653.

99.     The court addressed whether the corporation should be barred from bringing suit where there was no remaining shareholder who owned shares at the time of the mismanagement, even though a derivative action would clearly be appropriate by any shareholder who owned shares at the time of the alleged wrong. *Id.* at 654–55. The court also noted that the new controlling shareholder purchased his shares from the alleged wrongdoer, invoking the established principle that a purchasing shareholder cannot acquire greater rights than the selling shareholder had and cannot pursue a claim for mismanagement against his seller. *Id.* at 659–63. The court explained that to hold otherwise would be inequitable and would allow the purchasing shareholder to essentially reduce his purchase price although he suffered no financial injury. *Id.* at 663–64.

100.    The court reached its holding despite the officer's former misconduct, stating that "[b]ecause the inequitable conduct of [the officer] shocks the conscience of a chancellor is no reason why he should give his conscience a further shock by allowing [the purchaser] to recover money to which [he has] no legal or equitable claim." *Id.* at 664. "A plaintiff must recover on the strength of his own case, not on the weakness of the defendant's case. It is his right, not the defendant's wrong-doing that is the basis of recovery." *Id.* at 673. Stated otherwise, a concern of leaving prior corporate management unchecked was not adequate grounds to compel granting

standing to one who acquired his interest from the wrongdoer and did not directly suffer an injury.

101. In the absence of a shareholder who owned shares at the time of the misconduct, the corporation should not be allowed to pursue an equitable claim no shareholder could pursue individually. *Id.* at 669–70. The court noted a different result might be obtained in an action at law. *Id.*

102. Significantly, the court reached a different result when considering whether the corporation should be allowed to recoup money the officer had improperly withdrawn from the company and to assert a defense to the officer's claim for additional unpaid wages. *Id.* at 675. The court characterized the officer's earlier withdrawal of funds as a conversion that was not discovered until after a change in management had occurred. *Id.* The court found "a clear distinction between the company and its stockholders" when addressing "title to property and [the corporation's] right to its money and assets," and allowed the corporation to assert its own rights. *Id.*

103. The United States Supreme Court followed *Home Fire Insurance*, denying a corporation's standing in *Bangor Punta Operations, Inc. v. Bangor & Aroostook Railroad Co.*, 417 U.S. 703 (1974). The United States Supreme Court's opinion was issued over a strong dissent that argued that a contrary holding was necessary so that judicial review would deter future corporate misconduct. *Id.* at 717.

**(4)** ***Park Terrace* and the Contemporaneous Ownership Rule Do Not Bar Medflow's Defense to Plaintiffs' Claims.**

104.  With this background, the Court now turns to Defendants' argument as to why *Park Terrace* does not deprive them of standing.

105.  Defendants first argue that *Park Terrace* was tacitly overruled when the legislature enacted section 55-7-41 limiting a shareholder's standing to bring a derivative action to one who owned shares at the time of the wrong complained of without placing any limit on the corporation's standing.   The Court believes Defendants' argument seeks to fashion a legislative intent that is not evident.  The Court concludes that section 55-7-41 did not overrule *Park Terrace*.

106.  A more significant argument is that the facts now before the Court are distinguishable from, and outside the holding in, *Park Terrace.*  There are at least two clear factual distinctions between *Park Terrace* and this case.  First, Lindberg and Eli Global did not acquire Medflow's shares from the shareholders who are now accused of misconduct.  If *Park Terrace* solely rested on the notion that a buyer cannot sue his seller for mismanagement, then the holding would not bar Medflow's claim or defense. But the Court is persuaded that *Park Terrace*'s holding was not so narrow and that this distinction does not necessarily preclude applying the contemporaneous ownership rule to bar Medflow's standing.

107.  The second factual distinction has greater significance.  Plaintiffs seek to apply *Park Terrace* to bar the corporation from asserting an affirmative defense to Plaintiffs' own claims and a declaratory judgment claim, which essentially restates the defense.  Both *Park Terrace* and *Home Fire Insurance* focused on not allowing the

corporation's new shareholders to receive a windfall recovery. Here, there is an equitable argument that Plaintiffs, not Defendants, are seeking a windfall because they are seeking to recover large bonuses that they may not have been entitled to if their employment agreements had been disclosed to Medflow's shareholders. The Court does not rule on the underlying merits of the argument, but Medflow's position seems more analogous to Home Fire Insurance's claim to recover wrongfully converted funds from the former officer and its affirmative defense against its former officer's claim for additional salary payments, which were both allowed to proceed.

108. Nonetheless, the Court is confronted with competing public policies that were not resolved in *Park Terrace* or *Home Fire Insurance*. On the one hand, courts have an obvious interest in policing corporate misconduct. On the other hand, courts are reluctant to protect one who acquires a corporation while ignorant of its liabilities because of the purchaser's own lack of due diligence.

109. Had Lindberg inquired as to outstanding management contracts, he either would have been advised of Plaintiffs' agreements so that he could have taken those into account in his purchase deliberations, or he likely would have a claim based on any failure to disclose the agreements. The undisputed evidence suggests that Lindberg and his companies proceeded with the purchase without making such inquiries. As such, there is a strong policy argument that Lindberg and his companies should be deemed to have purchased Medflow "as is," with no basis for relief of any undisclosed liabilities.

110. If the issue was solely that Medflow wanted to recover money already paid to Plaintiffs prior to their termination, the Court would be inclined to deny Medflow's standing, because the current shareholders did not suffer an injury due to those payments. The Court is not persuaded, however, that those same equitable considerations should relieve Plaintiffs of establishing that the agreements, entered by and known only to themselves, were fair to Medflow before they are entitled to receive any future payments.

111. After careful analysis and weighing the competing public policies, equitable considerations, and the undisputed facts distinguishing this case from *Park Terrace*, the Court concludes, on balance, that Medflow has standing to defend against Plaintiffs' claims by seeking judicial review as to the enforceability of the employment agreements.

112. Accordingly, the Court holds that the contemporaneous ownership rule does not preclude Medflow's standing to assert its defense or to seek a declaration that the defense is valid. Having so held, the Court need not resolve the disputed issue of whether DJRTC became a beneficial shareholder prior to the Ehmann's execution of the Written Consent approving the employment agreements, thereby satisfying the contemporaneous ownership rule.

113. Therefore, Plaintiffs' motions for summary judgment are denied to the extent they assert that Defendants lack standing to defend against the enforceability of the employment agreements.

**B. There Are Material Issues of Disputed Fact as to Whether Plaintiffs' Agreements Were Unfair to Medflow When Entered.**

114. The parties promote different standards of review to assess whether Plaintiffs' employment agreements are enforceable. Plaintiffs contend that the agreements are entitled to the presumption of validity afforded by the business judgment rule unless Defendants can first establish that Plaintiffs breached their fiduciary duties to Medflow, either by failing to disclose facts or negotiating with a Medflow representative known or reasonably assumed not to be independently capable of representing Medflow's best interest. Defendants contend that each of the Plaintiffs were either a Medflow officer or director, that the employment agreements were therefore conflict-of-interest transactions, that Ehmann, as a director, did not take advantage of the statutory safe harbors, and that now each Plaintiff, consistent with well-established common law principals, must establish that their contracts were fair to Medflow when entered.

115. As to Schiffli, the Court must first determine whether the evidence supports the contention that Schiffli was a *de facto* officer when entering his employment agreement. If so, then he must meet the same burden as Throneburg.

**(1) There Is a Material Dispute as to Whether Schiffli Was a *De Facto* Officer When He Entered His Employment Agreement.**

116. The parties dispute whether Schiffli should be treated as an officer when he negotiated his employment agreement in July 2014, at which time he was Medflow's CFO although not elected as a corporate officer.

117. "[I]n North Carolina, an individual may owe a fiduciary duty to the corporation if he is considered to be a *de facto* officer or director, with authority for tasks such as signing tax returns, offering major input as to the company's formation and operation, or managing the company." *Kinesis Advert., Inc. v. Hill*, 187 N.C. App. 1, 15–16, 652 S.E.2d 284, 295 (2007). While merely assuming a title to an office may not alone be adequate evidence of being a *de facto* officer, the overall inquiry examines whether one continuously exercises the duties of an authorized corporate officer. *Havelock Yacht Club, Inc. v. Crystal Lake Yacht Club, Inc.,* 215 N.C. App. 153, 156, 714 S.E.2d 788, 790 (2011).

118. Schiffli was an elected officer of Medflow from 2010 until December 10, 2013. He was not an elected officer again until December 19, 2014. (Schiffli Dep. 23:13–15.) During the interim, Schiffli continued to operate in a senior financial management capacity and to refer to himself as Medflow's Chief Financial Officer, including that title in his e-mail signature. (*See* Schiffli Dep. 23:13–18; Gottumukkla Decl. Ex. A.)

119. By Throneburg and Ehmann's admission, Schiffli was a member of Medflow's senior management team when he negotiated his employment agreement with Throneburg. (Throneburg Aff. ¶ 108, July 15, 2016; *see also* Schiffli Dep. 23:8–10, 16–18.)

120. The Court concludes that there is adequate evidence to present a triable issue of fact as to whether Schiffli was a *de facto* Medflow officer at the time he negotiated and executed his employment agreement and therefore subject to

fiduciary duties of care and loyalty. Accordingly, Schiffli's Motion for Partial Summary Judgment is denied to the extent it rests on the assertion that Schiffli did not owe Medflow fiduciary duties when negotiating his employment agreement.

**(2) Plaintiffs' Employment Agreements Were Conflict-of-Interest Transactions and Are Not Protected by the Business Judgment Rule.**

121. Conflict-of-interest transactions between a corporation and its officers or directors have long been subject to special rules. For directors, a conflict-of-interest transaction is defined as "a transaction with the corporation in which a director of the corporation has a direct or indirect interest." N.C. Gen. Stat. § 55-8-31(a) (2015). The statute defines an "indirect interest" but does not define a "direct interest." *Id.* at § 55-8-31(b). The test of whether a director has a direct interest is a matter of common sense. Robinson, *supra*, § 15.01[1], at 15-3. It follows that common sense should dictate whether an officer has a direct interest in a transaction.

122. Common sense makes clear that each of the Plaintiffs had a direct interest in their own employment agreements, making these agreements conflict-of-interest transactions. While it may be appropriate for a fiduciary to negotiate in his own interest, it does not follow that he is entitled to the business judgment rule when doing so. *See In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 751 (Del. Ch. 2005). The business judgment rule, if applicable at all, would only apply to the person purportedly representing the corporation.

123. North Carolina's Business Corporation Act contains a section dealing specifically with transactions between a corporation and its directors. N.C. Gen. Stat.

§ 55-8-31 (2015). There is no corresponding provision for transactions between a corporation and its officers. Section 55-8-31 modifies the common law with regard to director transactions by specifying two safe harbors—(1) approval by a majority of the board of directors and (2) approval by a majority of the shareholders—that, when followed, protect the transaction from attack. *See id.* § 55-8-31(a)(1)-(2). Significantly, the board of directors' safe harbor requires that the directors who approve the transaction have no direct or indirect interest in the transaction. *Id.* § 55-8-31(c). Otherwise, a director must prove the transaction was fair to the corporation. *Id.* at § 55-8-31(a)(3).

124. Plaintiffs contend that these statutory safe harbors are optional, not mandatory. They further argue that an officer or director does not have an affirmative burden to prove fairness until a party challenging the transaction comes forward with evidence adequate to defeat an initial presumption of validity. In addition to being devoid of case support, that argument inverts the presumption applied at common law and is inconsistent with the limited statutory modification for director conflict-of-interest transactions provided by section 55-8-31.

125. Plaintiffs contend that an officer or director has no affirmative duty to prove that his compensation contract was fair to the corporation unless there is evidence that the officer or director: (1) manipulated the independent judgment of the director with whom the officer negotiated; (2) negotiated in bad faith, either by defrauding the company or seeking an unconscionable advantage; (3) failed to make a reasonable inquiry of the corporation's condition or acted inappropriately in regard

to matters such an inquiry discloses; or (4) intentionally failed to act or consciously disregarded his duty to act. (Pls.' Suppl. Br. Supp. Mots. Summ. J. 5.) Plaintiffs contend that an interested transaction is not voidable until there is adequate proof by an opposing party of one of those duty violations. (Pls.' Suppl. Br. Supp. Mots. Summ. J. 5.) At the hearing on these motions, Plaintiffs conceded that any presumption that the agreements are valid is lost if the opposing party demonstrates that the officer or director negotiating on behalf of the corporation is known to have a personal interest in the transaction. That is, as applied here, the presumption is lost if Throneburg or Ehmann had a direct or indirect interest in the other's agreement when representing Medflow in negotiations.

126. As to Ehmann's independence, Throneburg's own testimony concedes that Throneburg had given him substantial compensation increases before negotiations for Throneburg's agreement began. (Throneburg Aff. ¶¶ 103–105, July 15, 2016.) Ehmann and Throneburg had collectively agreed to a multi-year Strategic Plan and believed that the success of the Strategic Plan required long-term commitments from the senior management team, supporting, at least, an inference that Ehmann would expect that he, too, would receive a multi-year contract. Ehmann testifies that he regularly deferred to Throneburg's judgment, including his ability to draft agreements for each of them. (*See* Ehmann Aff. ¶ 91, Aug. 3, 2016.)

127. As to Throneburg's independence, among other factors, the evidence shows that, contrary to the contention that the terms of Throneburg's compensation agreement were completely fixed prior to Throneburg negotiating Ehmann's contract,

Throneburg and Ehmann continued negotiations in July 2014, resulting in the addition of a change-of-control bonus.

128. There is also a factual dispute whether Throneburg even had authority to act as a director and approve Ehmann's employment agreement. *Compare* N.C. Gen. Stat. § 55-8-01(d) (2015) (recognizing in some circumstances that the power of a board may be exercised by an individual with delegated authority) *with Grimes v. Donald*, 673 A.2d 1207, 1214 (Del. 1996) (explaining that certain duties of a board of directors are nondelegable).

129. The Court concludes that the record requires a finding, as a matter of law, that Throneburg and Ehmann had a direct or indirect interest when negotiating each other's agreements, and therefore, the presumption Plaintiffs argue for would have been lost, even if it was supported by law.

130. However, the Court believes that Plaintiffs' proposed standard of review is, in any event, inconsistent with established North Carolina corporate principles. A director, if not protected by the statutory safe harbors, or an officer when challenged, must prove that his interested transaction with the corporation is fair to the corporation. *See* N.C. Gen. Stat. § 55-8-31(a); *Highland Cotton Mills v. Ragan Knitting Co.*, 194 N.C. 80, 87, 138 S.E. 428, 431 (1927).

131. Plaintiffs argue that the Court is inappropriately imposing a standard of "entire fairness" similar to that adopted by the Delaware Court of Chancery in change-of-control situations, *see Revlon, Inc. v. Macandrews Forbes Holdings, Inc.*, 506 A.2d 173, 180 (Del. 1986), when the North Carolina legislature clearly rejected

that standard when it amended section 55-8-30 to provide that "duties of a director weighing a change of control situation shall not be any different, nor the standard of care any higher, than otherwise provided in this section." N.C. Gen. Stat. § 55-8-30(d) (2015).

132. However, Plaintiffs try to compare apples to oranges. The change to section 55-8-30 regarding duties in a change-of-control situation does not modify the duty of care a director has when negotiating his own interested transaction with the corporation. The Court is not imposing a heightened standard of care to a conflict-of-interest transaction. The same duty applies to all interested transactions between a corporation and its directors and officers. It does not vary depending on whether or not it relates to a change in control.

133. The North Carolina Business Corporation Act specifically articulates that in the absence of approval by a disinterested board or by shareholders, a director must prove that his interested transaction is fair to the corporation. N.C. Gen. Stat. § 55-8-30(a) (2015). At common law, a conflict-of-interest agreement between a corporation and its director or officer was presumed invalid so that the director or officer must demonstrate that the agreement was openly and fairly made and that the corporation formally authorized or ratified the agreement. Robinson, *supra*, § 15.01, at 15-1 to -2; *see also Highland Cotton Mills*, 194 N.C. at 87, 138 S.E. at 431; *Fowle Mem'l Hosp. Co. v. Nicholson*, 189 N.C. 44, 49, 126 S.E. 94, 97 (1925). It is true that the Supreme Court of North Carolina has also held that compensation agreements between a corporation and its officer or director are not per se void or

voidable. *Fulton v. Talbert*, 255 N.C. 183, 184, 120 S.E.2d 410, 411 (1961). But neither section 55-8-31 nor *Fulton* can be fairly read to erode the underlying concept that a transaction between a corporation and its officer or director should be fair to the corporation, nor do they provide that such fairness is presumed by application of the business judgment rule.

134. It is undisputed that the shareholders were not asked to approve the employment agreements. Further, Ehmann's employment agreement was not approved by an independent director of Medflow because, even if Throneburg was properly delegated such authority, Throneburg was not sufficiently independent to serve as a director for the purposes of approving Ehmann's agreement pursuant to section 55-8-31(a)(1). Whether an independent director approved Schiffli's or Throneburg's agreements is irrelevant because the statutory safe harbors do not apply to them and they must establish that their agreements were fair. Thus, on these facts, the Court concludes that Plaintiffs have not sustained their burden to justify a summary adjudication that the agreements were fair to Medflow.

135. In sum, Plaintiffs' Motions for Partial Summary Judgment are denied to the extent they contend that Plaintiffs need not affirmatively prove that their agreements were openly and fairly made. A jury must now determine whether Throneburg, Ehmann, and Schiffli, if he is found to be a *de facto* officer, can prove that their agreements were fair to Medflow when entered.

**(3)** **The Fairness Inquiry Includes Assessing Both Whether the Agreements Were Entered Through a Fair Process and Whether the Terms of the Agreement Were Fair to Medflow**

136. The Court now must determine the proper analysis the jury will use to assess whether Plaintiffs' agreements were fair to Medflow when entered. North Carolina has not adopted any rigid definition of fairness as applied to conflict-of-interest transactions. It is logical that what is fair must be measured by the overall circumstances of a particular transaction. The Official Comment to section 8.31 of the Model Corporation Act, the section on which N.C. Gen. Stat. § 55-8-31 is based, explains that

> [t]he fairness of a transaction for purposes of section 8.31 should be evaluated on the basis of the facts and circumstances as they were known or they should have been known at the time the transaction was entered into. For example, the terms of a transaction subject to section 8.31 should normally be deemed "fair" if they are within the range that might have been entered into at arm's-length by disinterested persons.

N.C. Gen. Stat. § 55-8-31, cmt. 4. Former section 55-30(b), which section 55-8-31 replaced, used a "just and reasonable" standard measured against an arm's length transaction. *See Meiselman v. Meiselman,* 309 N.C. 279, 309, 307 S.E.2d 551, 569 (1983) (quoting N.C. Gen. Stat. 55-30(b)(3)). This standard captured the essence of the common law requirement that a conflict-of-interest transaction be "openly and fairly made." *Meiselman,* 309 N.C. at 309 n.7, 307 S.E.2d at 569 (quoting R. Robinson, *North Carolina Corporation Law & Practice*, § 12-11, at 184 (3d ed. 1983)); *see also Hill v. Erwin Mills, Inc.*, 239 N.C. 437, 444, 80 S.E.2d 358, 363 (1954) (explaining that an inherently fair transaction "carries the earmarks of an arm's length bargain") (quoting *Pepper v. Litton,* 308 U.S. 295, 307 (1939)).

137. Plaintiffs contend that they only need to prove that the terms of their agreements are substantively fair, and if they do so, the agreements cannot be voided even if the procedure by which they were adopted was unfair. Defendants contend that a conflict-of-interest agreement can never be upheld if it was entered through an unfair process, even if the substantive terms are objectively fair. The Court concludes that neither party is correct.

138. Rather, the overall fairness inquiry should not be segregated into two separate components, but must compare both process and terms against an exemplary arm's length transaction. There is a necessary interplay between procedural and substantive fairness.

139. The Court has been, in part, guided by the more extensive body of Delaware case law applying a fairness standard to interested transactions. The Delaware Supreme Court recognizes that determining whether an agreement is fair requires assessing both the process by which it was entered and its terms, but that a fairness inquiry does not bifurcate along those considerations. *Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983); *see also Del. Open MRI Radiology Assocs., P.A. v. Keelser*, 898 A.2d 290, 311 (Del. Ch. 2006) ("[T]he two-part fairness test is not a bifurcated one"). Instead, determining fairness is a plenary inquiry into the "entire fairness" of the agreement. *Weinberger*, 457 A.2d at 711.

140. The decision by former Delaware Chancellor, and now Delaware Supreme Court Justice, Leo Strine, illustrates the interplay between process and terms, and how terms that may be fair in an arm's length transaction may

nevertheless be unfair when the process of securing those terms is considered. *See HMG/Courtland Props., Inc. v. Gray*, 749 A.2d 94, 116–18 (Del. Ch. 1999). In *HMG/Courtland Properties*, the interested directors sought to uphold a real estate transaction by proof that the final terms of the transaction fell within a range of fairness as measured by appraisals of the underlying property. *Id.* at 116. The court accepted that the directors may have proven that the terms might have been agreed to in an arm's length bargain, but the directors failed to prove that, in this particular transaction, the terms were not tainted by a manifestly unfair process. *Id.* at 116–18. Therefore, the court concluded that the terms were not fair "in the sense inherent in the entire fairness standard." *Id.* at 118.

141. However, Delaware does not follow a rule that process unfairness alone will defeat a transaction with terms that are substantively fair. *See Valeant Pharm. Int'l v. Jerney*, 921 A.2d 732, 748 (Del. Ch. 2007). After finding that a corporation had adopted a bonus program through an unfair process, Vice Chancellor Lamb stated that such a finding

> does not end the court's inquiry because it is possible that the pricing terms were so fair as to render the transaction entirely fair. Nevertheless, where the pricing terms of a transaction that is the product of an unfair process cannot be justified by reference to reliable markets or by comparison to substantial and dependable precedent transactions, the burden of persuading the court of the fairness of the terms will be exceptionally difficult. Relatedly, where an entire fairness review is required in such a case of pricing terms that, if negotiated and approved at arm's length, would involve a broad exercise of discretion or judgment by the directors, common sense suggests that proof of fair price will generally require a showing that the terms of the transaction fit comfortably within the narrow range of that discretion, not at its outer boundaries.

*Id.* at 748–49.

142. These Delaware decisions are fully consistent with North Carolina precedent directing that a conflict-of-interest transaction is fair only if it was openly made with terms consistent with an arm's length transaction. *See Hill*, 239 N.C. at 444, 80 S.E.2d at 363. Requiring consistency with an arm's length transaction necessarily measures both the negotiation process and the substance of the terms. There is a necessary interdependency between process and terms, and a dutiful inquiry into fairness must consider both together in the overall context of the transaction.

143. Here, Throneburg testified that he consulted market-based transactions when drafting the employment agreements. (Throneburg Aff. ¶¶ 126–29, July 15, 2016.) Plaintiffs have offered expert affidavits expressing opinions that the substantive terms of the agreements were fair to Medflow and consistent with an agreement negotiated at arm's length, (*see* Walker Aff. ¶ 12; Henson Aff. ¶ 24,) although one of Plaintiffs' experts, Thomas Henson, is careful to note that he expresses no opinion as to the fairness of the process by which the agreements were entered. (Henson Aff. ¶ 25.)

144. These expert opinions must be measured against the uncontested evidence that these agreements resulted from negotiations between a single CEO and a sole director without involving the controlling shareholder or any review by Medflow's outside counsel. Admittedly, Throneburg and Ehmann each testify that they were fully informed as to all material facts and circumstances when representing

Medflow in negotiations with the other. (*See* Throneburg Aff. ¶ 106, July 15, 2016; Ehmann Aff. ¶¶ 56–57.) But considering other evidence of record, there is a genuine dispute as to whether the agreements were consistent with a fair arm's length transaction.

145. Accordingly, each of Plaintiffs' Motions for Partial Summary Judgment must be DENIED. A jury must now determine whether Plaintiffs' employment agreements were fair to Medflow when entered. The jury will only address the fairness of Shiffli's agreement if it first finds he is a *de facto* officer.

## C. Defendants' Assertion of Unconscionability Merges Into the Overall Fairness Inquiry, Precluding Summary Judgment in Their Favor.

146. Defendants argue that the terms of the employment agreements are so unfair that they should be declared unconscionable and unenforceable as a matter of law.

147. In this context, the concept of unconscionability is more often referred to as a claim of corporate waste. If compensation terms rise to the level of being so egregious that no disinterested board could approve them in good faith, then the agreements may be found to constitute corporate waste. Robinson, *supra*, § 16.11, at 16-25; *see Grimes,* 673 A.2d at 1215 (1996) (holding that the business judgment rule cannot protect compensation decisions which are so egregious as to constitute corporate waste).

148. Here, Plaintiffs' experts' affidavits are adequate to raise a material dispute as to whether the substantive contract terms were fair to Medflow. Defendants' assertion of unconscionability collapses into the overall issue of fairness.

149. Accordingly, each of Defendants' Motions for Summary Judgment must be DENIED. The question of whether there is a basis to void the agreements as corporate waste will depend on the substantial evidentiary record presented at trial. The Court reserves determining whether this defense is applicable and if so, whether this matter is a question for the Court or for the jury.

## VI. CONCLUSION

150. For the foregoing reasons, each of the motions for summary judgment is DENIED. The Court will set a trial date on the Severed Issue as soon as practicable considering other trial engagements and will establish a further pretrial schedule.

IT IS SO ORDERED, this the 26th day of September, 2017.


/s/ James L. Gale
_____
James L. Gale
Chief Business Court Judge